FILED

2010 Dec-07  PM 03:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **STEVE GARRISON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-09-S-1329-NE** |
| | ) | |
| **BOEING COMPANY, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Steve Garrison, who is proceeding *pro se,* filed this case on July 2, 2009.  He asserts claims against his employer, Boeing Company, Inc. ("Boeing"), for violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII")*,* the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.* ("ADEA"), and the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* ("ADA").[1]  The case currently is before the court on defendant's motion for summary judgment on all of plaintiff's claims.[2]  Upon consideration of the motion, the pleadings, the briefs, and the evidentiary submissions, the court concludes the motion is due to be granted, and all of plaintiffs claims dismissed with prejudice.

---

[1]Doc. no. 1 (Complaint).
[2]Doc. no. 12.

# I. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[3] In other words, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)). Inferences in favor of the non-moving party are not unqualified, however. "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983). Moreover,

---

[3] Rule 56 was amended, effective December 1, 2010, in conjunction with a general overhaul of the Federal Rules of Civil Procedure. The Advisory Committee was careful to note, however, that the changes "will not affect continuing development of the decisional law construing and applying these phrases." Adv. Comm. Notes to Fed. R. Civ. P. 56 (2010 Amends.) (emphasis supplied). Consequently, cases interpreting the previous version of Rule 56 are equally applicable to the revised version.

> [t]he mere existence of some factual dispute will not defeat summary
> judgment unless that factual dispute is *material* to an issue affecting the
> outcome of the case.  The relevant rules of substantive law dictate the
> materiality of a disputed fact.  A genuine issue of material fact does not
> exist unless there is sufficient evidence favoring the nonmoving party
> for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (emphasis supplied).

*See also Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 251-52 (1986) (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

Parties who appear *pro se* are afforded a leniency not granted to those who are represented by counsel.  *Cf., e.g.*, *Hughes v. Rowe*, 449 U.S. 5, 9 (1980) ("It is settled law that the allegations of [a *pro se* complaint filed by a state prisoner], 'however inartfully pleaded,' are held to 'less stringent standards than formal pleadings drafted by lawyers.'") (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)); *Harmon v. Berry*, 728 F.2d 1407, 1409 (11th Cir. 1984) (same); *Woodall v. Foti*, 648 F.2d 268, 271 (5th Cir. June 16, 1981)[4] ("A *pro se* complaint, however inartfully drafted, must be held to less rigorous standards than the formal pleadings prepared by lawyers and can only be dismissed for failure to state a claim if it appears 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to

---

[4]In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

relief.'") (quoting *Haines*).

Even so, the leniency accorded *pro se* litigants is not unqualified. A *pro se* plaintiff "must still meet the essential burden of establishing that there is a genuine issue as to a fact material to his case." *Holifield v. Reno*, 115 F.3d 1555, 1561 (11th Cir. 1997) (citing *Brown v. Crawford*, 906 F.2d 667, 669-70 (11th Cir. 1990)).

## II. SUMMARY OF FACTS[5]

---

[5]Plaintiff did not respond, paragraph by paragraph, to any of defendant's proposed undisputed facts. Indeed, plaintiff's only response to defendant's arguments in support of summary judgment is a two-page brief that neither cites any evidence nor attempts to refute any of defendant's proposed facts. Therefore, all of defendant's proposed undisputed facts are deemed admitted. *See* doc. no. 7 (Uniform Initial Order), at 16 ("*All material facts set forth in the statement required of the moving party will be deemed to be admitted for summary judgment purposes unless controverted by the response of the party opposing summary judgment.*") (emphasis in original). Furthermore, by not citing evidence to support his arguments, plaintiff has failed to satisfy his burden under Federal Rule of Civil Procedure 56. The version of Rule 56(e) in effect on the date plaintiff filed his brief stated that "[w]hen a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must — by affidavits or as otherwise provided in this rule — set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party." The current version of Rule 56, effective December 1, 2010, states:

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). Furthermore,

Boeing is an aerospace company that manufactures commercial jetliners and military aircraft, as well as electronic and defense systems, missiles, satellites, and information and communication systems.[6]   Boeing has adopted a progressive discipline policy for its employees, including the following steps:  verbal warnings; written warnings in the form of Corrective Action Memos; time off without pay; and termination.  Supervisors consider a variety of factors, such as an employee's prior disciplinary history, when determining the appropriate level of discipline in any particular situation.  Corrective Action Memos generally only remain active in an employee's file for one year.[7]

Plaintiff began working for Boeing in 1995, when the company merged with

---

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:
>
> (1) give an opportunity to properly support or address the fact;
>
> (2) consider the fact undisputed for purposes of the motion;
>
> (3) grant summary judgment if the motion and supporting materials — including the facts considered undisputed — show that the movant is entitled to it; or
>
> (4) issue any other appropriate motion.

Fed. R. Civ. P. 56(e).  Because of plaintiff's *pro se* status, the court will strive to determine on its own whether there is any evidentiary support for plaintiff's arguments.  The court will only consider arguments that are supported by evidence in the record.  *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

[6]Doc. no. 14 (defendant's evidentiary submission), Tab 3 (Declaration of Loretta Kalibak), at ¶ 2.

[7]Defendant's evidentiary submission, Tab 2 (Affidavit of Mary Ann Burns), at ¶ 3.

McDonnell Douglas.[8]  Beginning sometime in 2006, plaintiff worked as a mechanical assembly technician in the "PAC-3" area at the Jetplex in Huntsville, Alabama.  He and his fellow workers were responsible for assembling the gimbal portions of the PAC-3 missile.[9]

For several months, plaintiff worked first shift in the PAC-3 area with an African-American female named Nicole Pugh.[10]  At first, plaintiff and Pugh were "close friends," but they stopped being friends in approximately February of 2006, after Pugh lied to plaintiff a few times, and plaintiff began to disagree with some of Pugh's lifestyle choices.  Plaintiff stopped taking Pugh's telephone calls and stopped talking to her outside their workplace.  Pugh then started acting "cocky" and "defensive," and she started picking fights with plaintiff.[11]  Plaintiff asked Pugh to "cool it" and to stop calling him after hours to tell him about her problems.  Pugh told plaintiff she was going to kill herself and "carry him with her."  She also told him:

> I'll have you fired out here.  She said I'm a black female and I have got problems, they can't touch me.  And she said Jerry likes me, Jerry McKinney over the programs, she said Jerry likes me and he don't like

---

[8]Defendant's evidentiary submission, Tab 1 (Deposition of Steve Garrison), at 6-7.

[9]*Id.* at 7-8, 20-21.  Plaintiff testified that the gimbal is "like a radar site" that helps the missile look for its target.  The gimbal is "pretty complex.  It's got  a lot of small gears and a lot of wiring. . . ." *Id.* at 20.

[10]*Id.* at 21-24.

[11]*Id.* at 10-15.

you, she said I'll have you fired from here.[12]

Plaintiff reported this incident to his supervisor, Marie Ray.  Ray counseled plaintiff and Pugh to leave their personal issues out of the workplace.  Ray also asked plaintiff if he thought he and Pugh could continue to work together.  Plaintiff said he would try, but Pugh immediately began to harass him by "snatching some drawings" from plaintiff's work area.[13]

Plaintiff then took his complaints about Pugh to Mary Burns, a Generalist in the Human Resources office.  He informed Ms. Burns that he was concerned about his safety because of Pugh's psychiatric issues.  Ms. Burns said she could not comment on Pugh's medical condition, but she did instruct plaintiff and Pugh not to interact with each other.[14]

Plaintiff requested to be moved to a different work area, but there were no openings in other areas on first shift.  In March of 2006, plaintiff had the opportunity to transfer to second shift, and he "jumped at that," in order to get away from Pugh. Plaintiff did not have any problems with Pugh during the time period when he was on second shift and she was on first shift.[15]  In approximately July of 2006, plaintiff

---

[12]Garrison Deposition, at 17.

[13]*Id.* at 17-19.

[14]*Id.* at 22-27.

[15]*Id.* at 23-28.

moved back to first shift, and Pugh moved to second shift. After that assignment, plaintiff did not have any more problems with Pugh until June of 2007.[16]

On or about June 22, 2007, plaintiff noticed that another vehicle had collided with his in the Boeing parking lot, damaging his bumper.  He believes that Wendell Fern, a supply van driver for Boeing who was dating Pugh at the time, intentionally caused the damage to his car.  Plaintiff has no evidence that Fern was responsible, but he speculates so because he had seen Fern driving the supply van in the parking lot on multiple occasions while walking to his car.[17]  Further, sometime in December of 2007, the paint on plaintiff's car was scratched while the car was in Boeing's parking lot.  Again, plaintiff has no evidence of who caused the damage, but he suspects it was someone who did not like him because of his differences with Pugh.[18]

On January 17, 2008, plaintiff had a verbal altercation with Andrea Smith, a female co-worker whose race is not clearly identified in the record.  Smith became "enraged," and she cursed plaintiff, threatened him, and pointed her finger in his face. The only possible explanation plaintiff offered for Smith's behavior was that Smith thought he was talking about her to the union steward.  Plaintiff felt threatened by

---

[16]*Id.* at 30-31.

[17]*Id.* at 31-35; *see also id.* at Exhibit 2 (July 18, 2007 statement to plaintiff).

[18]Garrison Deposition, at 46-47.

Smith's behavior, so he reported the incident to Boeing security.[19]  Security officers investigate the incident and determined that Smith had cursed plaintiff.  Smith received a Corrective Action Memo as a result of the incident.[20]  She also was transferred to second shift the following day, but plaintiff testified that the transfer had already been planned and was not a result of the altercation.  Boeing did not immediately escort Smith off the premises as it had done with other employees who had been involved in similar incidents in the past.[21]

On January 18, 2008, plaintiff received a verbal counseling for failing to inform the proper management official when he was going to be absent from or late for work.  Plaintiff acknowledged that he reported his absences and tardiness to co-workers rather than to his supervisor, as was required, but he maintains that other employees were not reprimanded for doing the same thing.[22]  Also on January 18, 2008, plaintiff complained to Loretta Kalibak, an Employee Relations Specialist at Boeing, that "PAC-3 management" was trying to get him fired, and that his car had been damaged by Boeing employees on two occasions in an effort to harass him.  He also stated that he believed the managers in PAC-3 favored Pugh over him.[23]

---

[19]*Id.* at 49-51.

[20]Burns Affidavit, at ¶ 6 and Exhibit 1 (Corrective Action Memo).

[21]Garrison Deposition, at 51-55.

[22]*Id.* at 61-62; *see also id.* at Exhibit 3 (Verbal Counseling).

[23]Kalonik Declaration, at ¶ 5.

On January 21, 2008, supervisors Terry Howard and Marie Ray issued plaintiff a written warning in the form of a Corrective Action Memo.  The Memo stated that plaintiff had failed to live up to the company's expectation that he would "treat others and expect to be treated with respect, dignity and trust."  More specifically, the Memo stated, "Steve, you have continued to have conversations concerning another employee and it has progressed to the point of harassment and is interfering with production and has caused disruption in the work area.  You have been previously directed not to discuss this employee with anyone."  Plaintiff refused to sign the Memo, but wrote on the bottom of the form that he considered the Memo to be "another form of harassment that has come from me calling security and reporting violent behavior toward me from another [B]oeing employee on 1-17-08."  According to plaintiff, the actions of which he was accused in the Memo occurred more than a year earlier, and he had never gotten in trouble for it before.[24]  It is not entirely clear from the record, but the court presumes the "other employee" referenced in the January 21, 2008 Corrective Action Memo was Nicole Pugh.

Plaintiff filed a grievance with his Union on January 22, 2008, challenging both the January 18, 2008 Verbal Warning and the January 21, 2008 Corrective Action Memo.  The grievance was resolved on February 21, 2008, with an agreement

---

[24]Garrison Deposition, at 65-67 and Exhibit 4 (1-21-08 Employee Corrective Action Memo).

that the January 18, 2008 Verbal Warning would be withdrawn.[25]

During the first days of February, 2008, Jerry McKinney, the PAC-3 Manager, allowed Nicole Pugh to move from second shift back to first shift, and back to plaintiff's immediate work area.  During her first or second day back in plaintiff's work area, Pugh accused plaintiff of moving computers around and giving her a computer that did not work.  McKinney came to investigate those allegations, but when he found out that plaintiff was not the one who moved the computers, he lost interest in the investigation.  Plaintiff speculates that the only reason McKinney allowed plaintiff to return to plaintiff's work area was so she could accuse him of various wrongdoings.[26]  Plaintiff complained to Kalibak about Pugh being reassigned to his work area.  Kalibak investigated and determined that Pugh's first shift assignment did not comply with the Union contract, so she reassigned Pugh to second shift.[27]  The record is not clear as to the exact date on which Pugh was reassigned to second shift.     On February 6, 2008, Pugh reported to Boeing Security that plaintiff had tried to run her off the road while she was driving to work.  A Boeing contract employee witnessed the incident and gave a written statement identifying plaintiff's car as the one that had attempted to run Pugh's car off the road.  Plaintiff

---

[25]Garrison Deposition, at 63, 65.

[26]*Id.* at 59-62.

[27]Kalibak Declaration, at ¶ 4.

was placed on paid suspension pending investigation of the incident.[28]   Plaintiff

denies that he tried to run Pugh off the road, but he did acknowledge that he made

sudden lane changes because the roads were wet and he wanted to avoid

hydroplaning.  He claims that he checked his mirrors before changing lanes, but he

did not see any other cars.[29]  Despite plaintiff's denials, Boeing Security determined

as a result of its investigation that plaintiff did attempt to run Pugh off the road.  As

a result, Boeing required plaintiff to submit to a fitness for duty evaluation before

returning to work.[30]   When he returned to work on March 14, 2008, he received a

Corrective Action Memo regarding the incident.  The Memo states:

> Steve, on February 6, 2008 at approximately 0600 hours, Nichole
> [sic] Pugh reported to Boeing Security that you attempted to run her
> from the roadway while enroute to work at the Boeing Jetplex facility.
> The incident occurred approximately one mile no[f] the Boeing
> facility on Wall-Triana Blvd.

> Steve, this incident was witnessed by a neutral party who
> provided, to Security, a written and signed statement that corroborated
> Ms. Pugh's statement.

> This behavior is in violation of 3PI-2616, 1k - Harassment (Non-
> EEO), "conduct that shows hostility toward an individual"; and, 1I -
> Intimidation of Others, "an Action or behavior that causes a person to
> be fearful of his/her well being."[31]

---

[28]*Id.* at ¶ 6.

[29]Garrison Deposition, at 68-69.

[30]Kalibak Declaration, at ¶¶ 7-8.

[31]Garrison Deposition, at Exhibit 5 (March 14, 2008 Corrective Action Memo).

Attached to the March 14, 2008 Corrective Action Memo was a Statement of

Expectations, which stated:

> Your human resources and management representatives are committed to working together with you to help you achieve a successful and positive workplace environment. In order to have a confident and winning workplace atmosphere, employees are expected at all times to engage in conduct that is consistent with the Boeing Code of Conduct and reasonable commonsense rules of conduct. It has become increasingly evident that there have been personal disagreements between you and Nichole Pugh that have impacted the workplace experience. In order to facilitate clear expectations going forward, we ask you to read and acknowledge your receipt/ agreement with the following expectations:

> - All employees are expected to commit to create an environment of respect that is free from abusive or intimidating behaviors.

> - As of March 14, 2008, there are no legitimate business reasons that would cause you to come into contact with Nichole Pugh as you perform your daily job tasks and responsibilities.

> - You will not take any actions that would cause to knowingly and/or intentionally come into contact with Nichole Pugh.

> - You will not make, or attempt to make, contact with Nichole Pugh by telephone, email, written correspondence, text messaging, or any other means of verbal or nonverbal communication.

> - Should you receive any unwanted contact of any kind from Nichole Pugh you will report it immediately to your human resources representative or to your management.

- You will not take any action that could reasonably be perceived as threatening or intimidating to another person in the workplace.

- Except to the extent that there is a need to know, you will not discuss Nichole Pugh, or any matter associated with Nichole Pugh, with any other Boeing employee or contractor, whether or not such discussions occur on Boeing's property or offsite.  This includes any and all discussions concerning past or present issues, claims, or disputes.

- If you have any questions regarding any item listed in this acknowledgment, you will immediately discuss your questions or concerns with human resources or management.

- To help you achieve a positive workplace experience, human resources will contact you weekly for the next four (4) weeks to follow-up on this matter.  Additional follow-up will be initiated if deemed necessary.  You are required to participate openly and honestly in these discussions and in any discussions concerning the subject of this statement of expectations.

We are committed to providing you the guidance and the resources necessary to assist you in improving this workplace environment issue.  We are confident in your ability to demonstrate the necessary commitment to improving this situation as we work towards our mutual success.[32]

On March 4, 2008, while plaintiff was on suspension, he filed a Charge of

Discrimination ("Charge") with the Equal Employment Opportunity Commission

---

[32]Garrison Deposition, at Exhibit 5.

14

("EEOC").[33]  He checked boxes to indicate that he was alleging discrimination based on race, sex, and retaliation.  He stated that the earliest instance of discrimination occurred on November 16, 2007, and the latest instance occurred on February 11, 2008.  The particulars of the Charge are as follows:

> I am a 51 year old White male.  I was hired by the above-named employer in May 1995.  My position is that of a mechanical technician.  I have been harassed, written up, and suspended.
>
> My car was vandalized in the employer's parking lot on December 3, 2007.  I was called into the office on January 6, 2008, and accused of running a Black co-worker, with whom I previously had a relationship, off the road on my way to work.  I was suspended from work four days[34] until the investigation was completed.  The incident took place off site, and I could not be identified as the person involved in the incident.  In a separate incident on January 17, 2008, a co-worker heard me talking to the union steward and thought I was talking about her.  She cussed me out in front of several others.  I followed procedure and called security.  On January 18, 2008, after that incident, I was retaliated against by being written up for failing to call management when I was absent on January 2nd and 5th.  I filed a grievance with the union and one of the write-ups was voided as January 5th was not a work day.  I believe the two younger females are being allowed to make false accusations against me.  On January 21, 2008, I was given a correction action for an incident that happened on December 21, 2007.  I believe that was in retaliation for calling security regarding the cussing incident.

---

[33]*See* Garrison Deposition, at Exhibit 1 (EEOC Charge).  Plaintiff actually signed the charge on March 3, 2008, but it was not stamped as "Received" by the EEOC until March 4, 2008.

[34]The court can discern no explanation for the apparent discrepancy between plaintiff's statement in his EEOC Charge that he was suspended for four days, and the other testimony of record, which seems to indicate that plaintiff actually was suspended for a much longer period of time.  The exact length of plaintiff's suspension is not necessarily material, however, when it is clear that he was paid throughout the entire suspension period, and he did not suffer any other adverse effects from the suspension.

I believe I have been discriminated against because of my race, White, sex, male, age, and in retaliation for reporting the cussing incident in violation of Title VII of the Civil Rights Act of 1964, as amended, and the Age Discrimination in Employment Act.[35]

Upon plaintiff's return to work, Boeing reassigned him to work at Redstone Arsenal.[36]  Plaintiff testified that he feels safer working at Redstone Arsenal, but he still does not think his transfer was fair.  He thinks "something should have been done with the girls and McKinney and anybody involved, the managers, I think something should have been done with them because that left the girls out there high-fiving. They high-five each other and laugh[] about getting me transferred and wrote up . . . ."[37]  He also thinks that, because members of management were "scared of all these black females," they placed all of the blame for plaintiff's and Pugh's differences on plaintiff, and allowed the females to escape responsibility.[38]  Plaintiff also thinks that McKinney showed particular favoritism to the girls who worked in his area, especially Pugh and Smith.  When those girls started having conflicts with plaintiff, McKinney turned against plaintiff as a result.

Plaintiff testified that, while his hourly rate did not change after he was

---

[35]*Id.* at 1.

[36]Kalibak Declaration, at ¶ 9.

[37]Garrison Deposition, at 73-74.

[38]*Id.* at 75.

transferred to the Arsenal, he began to earn significantly less overtime pay.[39]  Despite

that assertion, the records of plaintiff's work hours reflect that he actually earned

more overtime and double-time pay during the years 2008 and 2009 (*after* the

transfer) than during the years 2006 and 2007.[40]

Plaintiff contends that, on August 10, 2009, he was on the same flight to

Houston, Texas, as Jerry McKinney and David Suttons, another PAC-3 manager.

Plaintiff tried to avoid the two men, but once they noticed him, McKinney and

Suttons went to talk to the ticket agent.  Plaintiff boarded the plane after McKinney

and Suttons did, and when plaintiff passed by Suttons' seat, Suttons "was smiling as

if he was very pleased with himself."  A uniformed airline agent was sitting directly

across from Suttons, and the agent gave plaintiff "a very harsh and intimidating look"

when he walked by.  Plaintiff felt as though he was being made to "feel like some

kind of criminal the whole flight."  He reported the incident to Boeing, but he never

heard anything back on the report.[41]

On January 18, 2010, plaintiff's supervisor instructed him to help a white male

---

[39]*Id.*

[40]Burns Affidavit, at ¶ 8 and Exhibit B.

[41]Doc. no. 11 (statement by plaintiff), at unnumbered pages 4-5.  This statement was signed by plaintiff, but it has not been not been notarized or otherwise verified.  Therefore, it is questionable whether the statement even is appropriate for consideration on summary judgment.  In this instance, however, the court is willing to give the *pro se* plaintiff the benefit of the doubt and consider his statement.

employee named Bobby Gant with some work.  Plaintiff jokingly said, "oh no don't make [me] work with them mutha fuckers because they let Eric Howell tell them when they can take lunch or not."  Gant turned to plaintiff, put his forearm under plaintiff's chin and throat, and pushed plaintiff backwards while cursing at him and shaking his finger in plaintiff's face.  Gant also hit plaintiff in the face open-handed and stuck his finger in plaintiff's eye.  Plaintiff immediately walked to the manager's office to report the incident, and Gant followed the whole way, calling plaintiff names and "trying to pick a fight" with him.  Plaintiff believes someone at Boeing instructed Gant to assault plaintiff, so that plaintiff would fight back, and Boeing would have a reason to fire plaintiff.  Gant was not disciplined as a result of the January 18 incident.[42]

Plaintiff still is employed by Boeing.[43]  The Corrective Action Memos issued to him on January 21 and March 14, 2008 have expired.[44]

## III. DISCUSSION

Plaintiff asserts that he was subjected to "race and gender discrimination, retaliation and harassment," in violation of Title VII, the ADEA, and the ADA.[45]

_____

[42]Garrison Deposition, at 40-41. *See also*  doc. no. 11 (statement by plaintiff), at unnumbered pages 1-3.  *See also supra,* note 41.

[43]Garrison Deposition, at 64.

[44]Burns Affidavit, at ¶¶ 3-4.

[45]*See* Complaint, at ¶¶ 32, 36, 40.

## A.    Abandonment of ADA Claim

Plaintiff acknowledged during his deposition that his allegation that Boeing discriminated against him because of a disability in violation of the ADA "may have been a mistake."[46]   Indeed, there is no evidence that plaintiff suffers from any disability.   He asserts that Boeing violated the ADA when it subjected him to "purported work-related fitness for duty exams."[47]   However, he does not explain why such examinations would constitute a violation of the ADA, and the court can discern no viable basis for such a claim, especially since plaintiff does not suffer from any identified disability.   Accordingly, summary judgment is due to be granted in favor of defendant on plaintiff's ADA claim.

## B.    Disparate Treatment, Retaliation, and Adverse Employment Actions

As plaintiff does not claim to have any direct evidence of discrimination or retaliation, he must prove his claims with circumstantial evidence, navigating the burden-shifting framework set forth long ago in the cases entitled *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981).   Under that analysis, a plaintiff must first establish a *prima facie* case of disparate treatment or retaliation, which creates a

---

[46]Garrison Deposition, at 94-95.

[47]Doc. no. 15 (plaintiff's brief), at 1.

presumption of discrimination.  To rebut the presumption, the employer then must articulate a legitimate, nondiscriminatory, nonretaliatory reason for the disputed employment action.  If the employer does so, the presumption of discrimination and/or retaliation drops from the case, and the burden shifts back to the plaintiff to show that defendant's proffered reason is merely a pretext for unlawful discrimination and/or retaliation.  *See McDonnell Douglas*, 411 U.S. at 802-05; *Burdine*, 450 U.S. at 252-56.

To establish a *prima facie* case of either disparate treatment or retaliation under either Title VII or the ADEA, plaintiff must show, *inter alia,* that he suffered an adverse employment action.[48]   The standard for what constitutes an "adverse employment action" differs slightly, but significantly, between disparate treatment claims and retaliation claims.[49]

---

[48]To make out a *prima facie* case of disparate treatment, plaintiff must show that: (1) he is a member of a protected class; (2) he was subjected to an adverse employment action; (3) his employer treated similarly situated employees outside of his protected class more favorably than he was treated; and (4) he was qualified to perform the duties of his job.  *Burke-Fowler v. Orange County, Florida*, 447 F.3d 1319, 1323 (11th Cir. 2006).  To establish a claim of retaliation, a plaintiff must prove that (1) he engaged in statutorily protected activity, (2) he suffered a materially adverse action, and (3) there was some causal relation between the two events. *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir. 2008) (citing *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006)).

[49]Courts routinely apply the same standards used to evaluate Title VII claims and ADEA claims.  *See, e.g., Doe v. DeKalb County School District*, 145 F.3d 1441, 1448 (11th Cir. 1998) ("We can assist our consideration of the adversity standard under the ADA, therefore, by looking to the broader experience of our court and others with employment discrimination law."); *id*. at 1447-48 (comparing *Harris v. H & W Contracting Co.*, 102 F.3d 516, 523-24 (11th Cir.1996) (ADA); *Maddow v. Procter & Gamble Co.*, 107 F.3d 846, 852-53 (11th Cir.1997) (ADEA), *Collins v. State*

### 1.      Disparate treatment claims

Although the Eleventh Circuit has "not adopted a bright-line test for what kind of effect on the plaintiff's 'terms, conditions, or privileges' of employment the alleged discrimination must have for it to be actionable," it has clarified that "not all conduct by an employer negatively affecting an employee constitutes adverse employment action." *Davis v. Town of Lake Park, Florida*, 245 F.3d 1232, 1238 (11th Cir. 2001). Indeed, "[a]lthough the statute does not require proof of direct economic consequences in all cases, the asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment." *Id*. at 1239. Thus, "an employee must show a serious and material change in the terms, conditions, or privileges of employment." *Id.* (emphasis omitted). "Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." *Id.*

A thorough review of plaintiff's pleadings and testimony, construed in his

---

*of Illinois*, 830 F.2d 692, 702-04 (7th Cir.1987) (Title VII)).  This is so because these statutes often use the same "terms and conditions" language to proscribe discriminatory employment practices. *See* 29 U.S.C. § 623(a)(1) (ADEA), and 42 U.S.C. § 2000e-2(a) (Title VII).  For the same reason, courts rely on cases applying like-worded retaliation provisions in different statutes.  *See Passer v. American Chemical Society*, 935 F.2d 322, 330 (D.C. Cir. 1991) (noting that the ADEA retaliation provision, 29 U.S.C. § 623(d), "is parallel to the anti-retaliation provision contained in Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a), and cases interpreting the latter provision are frequently relied upon in interpreting the former").

favor, reveals that he is alleging the following adverse employment actions:  (1) vandalization of his car on June 22 and December 3, 2007; (2) the verbal assault by Andrea Smith; (3) receipt of a verbal warning on January 18, 2008, for failing to properly report absences and tardiness; (4) receipt of a Corrective Action Memo on January 21, 2008, for having inappropriate discussions about a co-worker; (5) reassignment of Nicole Pugh to plaintiff's work area in early February 2008; (6) receipt of a Corrective Action Memo on March 14, 2008, for allegedly trying to run Nicole Pugh off the road on February 6, 2008; (7) the requirement to submit to a fitness for duty examination; (8) his suspension during the investigation of the February 6, 2008 incident; (9) his reassignment to Redstone Arsenal; (10) his encounter with Jerry McKinney and David Suttons on an August 10, 2009 flight; and (11) the physical attack by Bobby Gant on January 18, 2010.

As an initial matter, there is no proof that Boeing was responsible for the vandalization of plaintiff's car or the verbal and physical assaults inflicted by plaintiff's co-workers.  Plaintiff claims that these actions were all part of Boeing's conspiracy to provoke him into the commission of some act that would justify the termination of his employment, but plaintiff offers nothing other than sheer speculation to support his theory.  Speculation alone is not sufficient to move a claim past defendant's motion for summary judgment.  Further, the reassignment of Pugh

to plaintiff's work area in early February 2008 cannot be considered a materially adverse employment action, as there is no indication that Pugh's presence in plaintiff's work area had any effect on his work, other than to annoy him.  In any event, soon after plaintiff complained of the situation, Pugh was again reassigned to a different shift, so the annoyance plaintiff experienced was short-lived.  Similarly, the fact that another Boeing employee (even a superior employee) smirked at plaintiff as he boarded an airplane, and being glared at by an airline official, had no effect on plaintiff other than to inflict personal discomfort and to fuel plaintiff's conspiracy theory.  Finally, being required to submit to a fitness for duty examination before returning to work from his suspension in March of 2008 did not have any material effect on plaintiff's employment.  In fact, the contrary is true.  Because plaintiff submitted to the fitness for duty examination, he was allowed to return to work from suspension.  Therefore, his work situation actually *improved* as a result of the examination.  In summary, none of the above incidents or occurrences can be considered more than an "unkind act" or a "trivial slight."  *See Doe v. Dekalb County School District*, 145 F.3d 1441, 1449 (11th Cir. 1998) (quoting *Wu v. Thomas*, 996 F.2d 271, 273 n.3 (11th Cir. 1993) *(per curiam)*); *Williams v. Bristol-Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir. 1996) (Posner, C.J.) (*quoted with approval in Doe*, 145 F.3d at 1449).  Because the anti-discrimination statutes were not intended to

serve as "general civility codes," or to protect employees from "the ordinary tribulations of the workplace," *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998), those statutes do not provide a remedy for the allegedly adverse employment actions listed above.

The other allegedly adverse employment actions identified by plaintiff are slightly more substantial than those discussed in the preceding paragraphs, but they still did not cause any serious and material change in the terms, conditions, or privileges of plaintiff's employment.  Plaintiff received one verbal warning and two written Corrective Action Memos, but there is no indication that any of those disciplinary measures had any *materially* adverse effect on plaintiff's employment. The verbal warning actually was suspended after plaintiff filed a grievance, and the two Corrective Action Memos expired after one year.  Plaintiff also was suspended for an unspecified period of time while Boeing investigated whether he had attempted to run Pugh off the road.  Even so, plaintiff was paid throughout the suspension period, and there is no indication that plaintiff lost any kind of employment benefit as a result of the suspension.  Finally, plaintiff complains that his reassignment to Redstone was materially adverse because he earned significantly less overtime pay after the transfer, and because the transfer prohibited him from ascending to a "grade

8" position.[50]   However, the record indicates that plaintiff actually earned *more* overtime and double-time pay during the two years *following* his transfer than he earned during the two years *prior to* his transfer.   Furthermore, plaintiff acknowledged that he was satisfied with the transfer, and that he felt safer working at the Arsenal.   Finally, plaintiff offers nothing but speculation to support his assertion that the transfer has prevented him from being promoted to a "grade 8" position.

Based on the foregoing, plaintiff has not identified any materially adverse employment action that would have a tangible effect on his employment. Accordingly, he cannot establish a *prima facie* case of discrimination, and summary judgment is due to be granted in favor of defendant on his claims for disparate treatment pursuant to Title VII and the ADEA.

### 2.    Retaliation claims

Plaintiff similarly cannot demonstrate that he suffered any "adverse employment action" as that term is defined by the anti-retaliation laws.  In order to sustain a retaliation claim, an employee must show that "a reasonable employee would have found the challenged action materially adverse," such that the action would "dissuade[ ] a reasonable worker from making or supporting a charge of

---

[50]Doc. no. 18 (plaintiff's supplemental brief), at 1-2.

discrimination." *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 68 (2006).   "[T]rivial harms" and "petty slights" do not constitute adverse employment actions. *Id.*

As discussed in the preceding paragraphs, most of the alleged "adverse employment actions" about which plaintiff complaints actually are no more than "trivial harms" or "petty slights."   Even the verbal and written warnings plaintiff received are not sufficiently "adverse" under the retaliation standard. *See Bush v. Regis Corp.*, 257 Fed. Appx. 219, 222 (11th Cir. 2007) (finding warning letters, among other things, insufficient to establish adverse employment action under newly articulated *Burlington* standard).   The court also concludes that plaintiff's suspension — because it was fully paid and did not cause any other adverse effects on his employment — would not have deterred a reasonable employee from making complaints of discrimination.   Nor would plaintiff's transfer to Redstone Arsenal.   As a result of the transfer, plaintiff received what he most desired:   separation from Nicole Pugh.   He acknowledged that he felt safer working at the Arsenal, and he earned even more overtime and double-time pay after the transfer than he did before. A reasonable employee likely would welcome those changes, and not be deterred by them.

In summary, plaintiff has not presented any evidence that he suffered any

adverse action that would dissuade a reasonable employee from pursuing complaints of discrimination.  Accordingly, he cannot support a *prima facie* case of retaliation, and summary judgment is due to be granted on his retaliation claims.

## C.    Harassment Claims

Plaintiff claims that he was subjected to unlawful harassment on the basis of his gender, age, and race.[51]  To support those claims, plaintiff must show: (1) he belongs to a protected group; (2) he has been subject to unwelcome harassment; (3) the harassment was based on a protected characteristic, such as plaintiff's gender, age, or race; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of plaintiff's employment and create a discriminatory abusive working environment; and (5) the employer is responsible for such environment under a theory of either vicarious or direct liability.  *E.g., Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002).

As an initial matter, much of the alleged "harassment" of which plaintiff claims actually consisted of discrete employment actions, such as reassignments and the

---

[51]Defendant inexplicably did not offer any argument to support the granting of summary judgment on plaintiff's harassment claims in its original summary judgment briefing.  *See* doc. no. 13 (defendant's original brief); doc. no. 16 (defendant's reply brief).  The court refused to give consideration to defendant's undeveloped and unsupported arguments, and required defendant to file additional briefing before it would consider whether summary judgment should be granted on plaintiff's harassment claims.  *See* doc. no. 19.  Defendant did file an additional brief (doc. no. 21), and the court will consider the arguments advanced therein in determining whether to grant summary judgment on plaintiff's harassment claims.

issuance of verbal and written warnings.  Those actions were properly considered as part of plaintiff's gender-, age-, and race-based disparate treatment claims, but they cannot form the basis of a harassment or hostile work environment claim.  *See Davis v. Coca-Cola Bottling Co. Consolidated,* 516 F.3d 955, 970 (11th Cir. 2008) (holding that "hiring decisions, light work assignments, and alleged retaliation constituted discrete acts, not acts that were part of a hostile work environment").

There is no evidence that any of the other incidents of which plaintiff complains were based upon his gender, age, race, or, for that matter, *any* other protected characteristic.  Plaintiff's theory appears to be that he was harassed and otherwise treated unfavorably either because (a) management officials generally favored Nicole Pugh and other younger, black females, or (b) because management officials were afraid to discipline or otherwise "stand up to" the younger, black female employees, including Nicole Pugh, for fear of litigation, and they consequently blamed plaintiff for most of the trouble arising out of his disputes with Pugh and harassed him in an effort to provoke him or into the commission of some act that would justify termination, or persuade him to voluntarily resign his employment.  The allegedly harassing incidents plaintiff identifies, however, do not support such an extensive conspiracy, and do not serve as evidence of unlawful discrimination on the basis of a protected characteristic.

To the extent plaintiff complains of harassment by Nicole Pugh herself, all of the incidents he identifies reflect personal animosity between plaintiff and Ms. Pugh,[52] not discrimination because of plaintiff's gender, age, or race.  For example, after plaintiff asked Pugh to stop calling him, Pugh threatened to have him fired and removed some drawings from his work area.  She later accused plaintiff of moving computers around, giving her a computer that did not work, and trying to run her off the road.  There is no evidence that Pugh ever directed a gender-, age-, or race-based comment to plaintiff, and no evidence of any other manifestations of a discriminatory animus based upon such characteristics.  "Title VII was never intended to protect employees from all unpleasant and rude conduct in the workplace."  *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1253 (11th Cir. 1999).  Instead, "[i]t is an *anti-discrimination* statute."  *Id.* at 1253-54 (emphasis supplied). The Eleventh Circuit has, therefore, begun to draw distinctions between "actions based on discriminatory animus" — *i.e.*, those in which the harassment complained of was committed *because of the plaintiff's protected characteristic* — "and those based on *personal animosity resulting from failed consensual relationships.*"  *Pipkins v. City of Temple Terrace*, 267 F.3d 1197, 1200 (11th Cir. 2001) (*quid pro quo* claim) (emphasis supplied).[53]  A

---

[52]Plaintiff alleged in his complaint that his relationship with Pugh had been romantic in nature, but the evidence of record does not conclusively establish whether the relationship was romantic or platonic.

[53]The *Pipkins* Court took care to observe that:

plaintiff "cannot turn a personal feud into a sex discrimination case. . . ." *Succar v. Dade County School Board,* 229 F.3d 1343, 1345 (11th Cir. 2000) (citing *McCollum v. Bolger*, 794 F.2d 602, 610 (11th Cir. 1986)) (footnote and internal quotation marks omitted).   Plaintiff undoubtedly found Pugh's behavior to be annoying or even threatening, but, absent any evidence of a discriminatory animus, it is not the court's job to address their personal dispute.

Plaintiff also complains of five other allegedly harassing incidents involving other Boeing employees, none of which have any gender-, age-, or race-based connection.   First, he alleges that his car was damaged on two occasions in the Boeing parking lot.   He *suspects* that the damage was inflicted on both occasions by someone who was motivated by his differences with Pugh, but he has no evidence to support his suspicions.   Plaintiff's speculation is not sufficient to establish a gender-, age-, or race-based discriminatory animus.   Next, plaintiff complains about his January 17, 2008 verbal altercation with Andrea Smith, a female co-worker.   He testified, however, that Smith was probably angry with him because she thought he

---

This court does not today decide that once a consensual relationship between a supervisor and a subordinate is established, the subordinate could never then become victim to *quid pro quo* sexual harassment by that supervisor subsequent to the termination of the relationship.   We hold only that the facts and circumstances of this case operate to take the motivation for any harassment that might have occurred out of the scope of Title VII.

*Pipkins v. City of Temple Terrace*, 267 F.3d 1197, 1201 (11th Cir. 2001).

had been talking about her to the union steward.  That testimony may indicate personal animosity between plaintiff and Smith, but it does not constitute proof of a discriminatory animus.  Plaintiff also complains of being harassed by Jerry McKinney and David Suttons on an August 10, 2009 flight to Houston, Texas.  Even assuming that the behavior of which plaintiff complains — looking at plaintiff, talking to a ticket agent, smirking at plaintiff, and causing an airline agent to give plaintiff a harsh look — could constitute unlawful harassment, there is no indication that McKinney's and Suttons' actions had anything to do with plaintiff's gender, age, or race.  Finally, plaintiff complains of his altercation with Bobby Gant on January 18, 2010.  However, the evidence indicates that incident was a result of a comment plaintiff made, not the result of plaintiff's gender, age, or race.

In summary, there is no evidence that plaintiff was subjected to any harassment based upon his gender, age, race, or any other protected characteristic.  Even if all of the incidents about which plaintiff complains *were* motivated by a discriminatory animus, however, he still could not satisfy the fourth element of a harassment claim, *i.e.,* that the harassment was sufficiently severe or pervasive to alter the terms and conditions of his employment and create a discriminatory abusive working environment.  To satisfy this element, plaintiff must show *both* that he subjectively believed the environment to be hostile or abusive, *and* that a reasonable person also

31

would perceive it as such.  *See, e.g., Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21-22 (1993).  When evaluating the objective severity of offensive conduct, courts examine the totality of circumstances, including such factors as:  (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct was threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interfered with plaintiff's work performance.  *See, e.g., Johnson v. Booker T. Washington Broadcasting Service, Inc.,* 234 F.3d 501, 509 (11th Cir. 2000) (quoting *Mendoza,* 195 F.3d at 1246); *Edwards v. Wallace Community College,* 49 F.3d 1517, 1521 (11th Cir. 1995).  It is not necessary to prove each of the factors individually.  However, the factors, taken together, must reveal conduct that is so extreme that it caused a material change in the terms and conditions of plaintiff's employment, and created a working environment that a reasonable person would find discriminatorily abusive.  *See, e.g., Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citations omitted).

Certainly, at least some of the incidents about which plaintiff complains — including the damage to his car, his altercations with Andrea Smith and Bobby Gant, and Pugh's accusation that plaintiff tried to run her off the road — could be considered "severe" or "threatening," as they involved actual or threatened harm to plaintiff's person and/or property and the possibility of implicating plaintiff in

criminal liability.  Even so, any connection between these events and a protected characteristic is tenuous at best, as is the evidence of any unreasonable interference with plaintiff's work performance.  Most importantly, plaintiff complains of a total of only eight incidents that allegedly occurred between June of 2007 and January 18, 2010.  Although "there is no magic number for frequency," the relevant case law indicates that eight incidents over a two-and-a-half-year period should not be considered "pervasive." *Lawrence v. Wal-Mart Stores, Inc.,* 236 F. Supp. 2d 1314, 1325 (M.D. Fla. 2002) (citing *Miller v. Kenworth of Dothan, Inc.,* 277 F.3d 1269, 1275 (11th Cir. 2002)).  *Compare Miller,* 277 F.3d at 1276 (holding that verbal ethnic slurs uttered by a co-employee "three to four times a day," throughout the approximately one-month period plaintiff worked with the employee, were sufficiently frequent) *and Johnson,* 234 F.3d at 509 (holding that "roughly fifteen separate instances of harassment over the course of four months" was sufficiently frequent) *with Mendoza,* 195 F.3d at 1248-49 (holding that four incidents over an eleven-month period were insufficiently frequent)*, Shepherd v. Comptroller of Public Accounts of Texas,* 168 F.3d 871, 872-75 (5th Cir. 1999) (holding that *several* incidents over a two-year period were insufficient), *and Baskerville v. Culligan International Co.,* 50 F.3d 428, 430 (7th Cir. 1995) (holding that nine instances of offensive behavior over seven months were insufficient).  Considering the totality of

the circumstances, the court finds that the allegedly harassing incidents about which plaintiff complaints — even if they were based upon a protected characteristic — were neither sufficiently severe nor pervasive to materially alter the terms and conditions of plaintiff's employment.

Plaintiff cannot establish all the necessary elements of his claims for harassment based upon gender, age, or race. Accordingly, summary judgment is due to be granted in favor of defendant on all of plaintiff's harassment claims.

## IV. CONCLUSION AND ORDER

In accordance with the foregoing, defendant's motion for summary judgment is GRANTED, and all of plaintiff's claims are DISMISSED with prejudice. Costs are taxed to plaintiff. The Clerk is directed to close this file.

DONE this 7th day of December, 2010.

_____
United States District Judge

34